### T. A. ROBERTSON & 'COMPANY v. GEORGE D. RUSSELL ET AL.

Decided June 7, 1908.

**1.—Change of Venue—Statute Construed.**

Upon a proper application for change of venue of a civil case, it is mandatory upon the trial court to enter an order of removal to the nearest adjoining county, unless the disqualification of such adjoining county is shown in the application. Such qualification must appear in and from the application. When the application is controverted, the controversy might be as to the alleged disqualification of either the county where the suit is pending or of the adjoining county, or of both. Application for change of venue and alleged disqualification of adjoining county considered, and held, no abuse of discretion to order the case removed to the adjoining county.

**2.—Evidence—Reading Part of Written Instrument—Rule.**

The rule that where one party has introduced in evidence a part of a writing, the opposite party has a right to introduce the whole of the writing, means and refers to the whole of the writing bearing on, having connection with, and relating to the same subject matter as that introduced which is necessary to make it fully understood or to explain the same. It does not include immaterial or irrelevant matter.

**3.—Trial—Issue—Charge.**

Where, in a suit for the rental of land, plaintiff's petition contained two counts, one upon a written contract and the other upon *quantum meruit,* and the court by its charge limited the right of plaintiff to a verdict to a finding by the jury that a written contract was actually executed, it was not error to refuse to instruct the jury that the antecedent negotiations did not amount to a contract.

**4.—Contract—Execution—Evidence.**

The issue being whether or not a contract had been executed, evidence considered, and held sufficient to require the court to submit the issue to the jury.

**5.—Contract by Letter—Acceptance—Evidence.**

Where correspondence and negotiations preliminary to a contract are transmitted and conducted through the mails, it is not indispensable that the letter of acceptance should be actually received. An acceptance may be inferred from the subsequent conduct of the parties.

Appeal from the District Court of Midland County. Tried below before Hon. Jas. L. Shepherd.

*S. J. Isaacs* and *Miller & Dycus,* for appellants.—The District Court of Martin County erred in changing the venue of the above styled and numbered cause to Midland County, Texas, instead of changing the venue of said cause to some other county where the defendants could obtain a fair and impartial trial. Rev. Stats. of Texas, 1895, arts. 1271, 1272, 1273.

Where one party has introduced part of a writing, the opposite party has a right to introduce the whole of said writing. Stringfellow v. Thomson, 1 Texas App. Civ. Cas., 565, 566; Parlin, etc., Co. v. Miller, 60 S. W., 881; Hughes v. Driver, 50 Texas, 180; Smith v. Chenault, 48 Texas, 459.

The court erred in refusing to permit the defendants to prove by the witness, T. A. Robertson, testifying in behalf of the defendants, that at

the time of the conversation over the long distance telephone between A. L. Camp and Winfield Scott, said Scott, immediately after said conversation was finished, said: "We are going to lose the land and get into a law suit, too;" because said statement was a part of the res gestae of said conversation, and was admissible and pertinent to enable the jury to determine the credibility of the testimony of the witness A. L. Camp and Winfield Scott. International & G. N. Ry. Co. v. Anderson, 82 Texas, 519.

Whenever, in the negotiations between parties looking to the making of a contract, it is contemplated by them that the contract should be in writing, then it is not complete until it is written and executed. Hammond v. Winchester, 2 So., 892; Edge Moor Bridge Works v. Bristol County, 49 N. E., 918; Lyman v. Robinson, 14 Allen (Mass.), 254; Mississippi, etc. v. Swift, 29 Atl. (Me.), 1065-1067; Ferre Canal Co. v. Burgin, 30 So., 863; Dunham v. Boston, 12 Allen (Mass.), 375; Wardell v. Williams, 28 N. W., 796.

In order for a contract to be completed, the acceptance of a proposal must be upon the exact terms of the offer, and without condition. Ingham & Son v. Cisco Oil Mill, 86 S. W., 630; Flomerfelt v. Hume, 31 S. W., 680; First Nat. Bank v. Hall, 101 U. S., 43; Minneapolis, etc., v. Columbus, 119 U. S., 149-153; Kleihans v. Jones, 68 Fed., 749; Egger v. Nesbit, 27 S. W., 387.

When an offer is made by parol, an acceptance thereof by letter will not effect a contract unless the letter be actually received by the party who made the offer. Willis v. Turnley, 1 Texas App. Civ. Cas., 433, 434; Manhattan Life Ins. Co. v. Fields, 26 S. W., 281; Missouri Pac. Ry. Co. v. Kuthman, 2 Texas App. Civ. Cas., 463.

*Camp & Caldwell* and *Cowan, Burney & Goree,* for appellees.

LEVY, Associate Justice.—By their petition filed in the District Court of Martin County, the appellees sought to recover against the appellants on two counts or two theories; one was to recover upon a lease, as an original contract, of certain grazing lands; and the other, to recover upon a *quantum meruit* for the use and possession of grazing lands belonging to appellees.

The case was tried in Midland County, upon a change of venue from Martin County. The trial was by jury, who returned a verdict in favor of appellees upon the original lease sued on. The appellants have appealed from the judgment entered in accordance with the verdict, and seek to have the case reversed for errors assigned.

The evidence established the following material facts: Appellees owned, in 1903, a great many sections of pasture land in Gaines County, Texas. Appellants, T. A. Robertson & Co., composed of Winfield Scott and T. A. Robertson, controlled and had possession of what is known as the Wardswell pasture in Gaines County, which enclosed a large portion of country, and upon which they were grazing cattle, and in which pasture the thirty-nine sections of land in controversy were principally located. Camp & Caldwell, a firm of lawyers composed of A. L. Camp and J. M. Caldwell, of Midland, Texas, represented appellees in the management and leasing of said thirty-nine sections of land. Winfield

Scott was the managing partner of the firm of T. A. Robertson & Co. On May 12, 1903, Camp & Caldwell wrote a letter to appellant Scott relative to further leasing of the land and paying back rent on the lands. The letter in material part read: "We beg to inquire whether you desire to re-lease all of these lands at 5 cents per acre for a term of two years, and to pay 3 cents per acre for the time that you have occupied the pasture on the lands that you have not had leased, and which belong to these parties. If you do not desire to re-lease at this price, then we desire to know whether or not you are ready to make a settlement for the back rentals." Scott replied to this letter, in material parts saying: "I will take the lands on a lease for two years; but I think you ought to let me have it for three cents, as nobody else is paying more for railroad lands. I will also settle for the two years back rent. Just as soon as convenient I will have my pasture surveyed by Mr. Knott, the county surveyor. Then I will come to Midland and make a lease and settle up, and bring you a plat of Knott's work." Thereafter there were one or two casual meetings between Scott and either Camp or Caldwell, and this matter was briefly referred to, but nothing was done about it until July 28, 1903, when Caldwell met Scott in front of the Metropolitan Hotel at Fort Worth. According to Caldwell's testimony, they there agreed upon a settlement of the rents past due and for the lease of the lands for the next two years. Caldwell testified that the agreement was that Scott should pay for the land at 3 cents per acre per annum from the time that he had occupied the same, viz.: from January 1, 1902, to May 1, 1902, or to the time the negotiations had been taken up in the letter of May 12 looking to the lease of the lands, and that a lease should be executed to run from May 1, 1903, for two years, at 5 cents per acre per annum. The only thing that was left open was the actual signing of the lease by the appellees, and the payment of the money. Scott testified that in this meeting he agreed to lease the lands for the two years, but refused to agree to pay the back rentals. About the 20th of August, 1903, Scott and Caldwell met again, in the lobby of the bank in Midland, Texas. According to the evidence of Caldwell the arrangement and agreement at Fort Worth were there confirmed by further conversation. And Scott was insisting that he hurry appellees in their signature to the lease, saying, "I must have that lease. Send ahead and get it—and get it as soon as you can for me," and said that the money was ready as soon as Caldwell got back the lease. The money was to pay first year's rental and the back rentals. Scott testified that he agreed to take the lease, but refused to pay the back rental.

On September 1, 1903, Camp & Caldwell secured from appellees the lease in duplicate, signed and acknowledged and drawn according to the agreement of July 28 at Fort Worth, and enclosed in a letter to Scott requesting him to sign and acknowledge and return one of the copies to them together with New York exchange for amount of first year's rental and also the amount of the back rental. Camp & Caldwell received no reply to this letter, and wrote two or three more letters, and finally got a reply of date October 16, 1903; and having signed the lease on his part, Scott returned one of the copies to Camp & Caldwell with New York Exchange for $1,248, but declined to send the money for the back rental. Camp & Caldwell at once returned the exchange to

Scott, and refused to close the deal unless the back rentals were also paid. Scott replied to this letter and said that there was some misunderstanding about it, and requested Caldwell to come to Fort Worth and see him about it. To this Caldwell replied, insisting upon the return of his copy of the lease which Scott held. In this attitude the matter stood until November 12, 1903, when a conversation occurred over the 'phone between Camp at Midland and Scott at his ranch near there. Camp testifies as to the conversation, in material substance, that "when I called him up I asked him what he was going to do about this lease proposition. His reply was that we had 'been writing him insulting letters.' I replied that I had only asked him to do what he had agreed to do—to pay back lease and the first years' rental—and that if he did not desire to carry out the contract made between him and Caldwell, to return the lease to us, or his copy of the lease, and we would pass the matter up to our clients. Scott replied that he had 'tendered us New York exchange for the first year's rental;' that he had the lease and was going to keep it, and was not going to pay any back rental because he had been advised by his attorneys that he was not liable, and that Mr. Caldwell had not kept his word to give him a bond to protect him against other parties who claimed to own the land during the time he was to pay back lease. I replied, 'Mr. Scott, my instructions from our clients are that if this matter is not settled that they are going to cancel your lease, and lease the land to other parties.' Scott replied: 'If they do I will sue them for damages. I have got that lease, and have tendered you New York exchange for the rental, and have leased the land; and if you lease that land to anybody else I will sue you for damages.'" In the matter of back rents, 'Camp says: "Mr. Scott suggested that the back lease be litigated." Camp replied: "Mr. Scott, what is the use to have litigation?" Scott replied: "I don't care for litigation; let them sue me if they want to, if they think I am liable." Scott in his evidence admits the conversation over the 'phone with Camp, but denies that he said that if the appellees canceled the lease he would sue for damages, and denies that he said that he was going to hold the lease and that he would litigate the back rentals, and claimed that he said he would not pay back rental and would not agree to insert it in the lease. Thereupon Camp & Caldwell communicated the conversation testified to to the appellees, and after hearing from them wrote a letter to Scott stating that they had been instructed by appellees to accept the rentals on the lease, and would let the back rentals rest for the present, the acceptance of the lease money not to be a waiver thereof; and requesting remittance of the first year's rental. Receiving no reply to their letter, Camp & Caldwell again wrote asking a reply and to send in the lease price. In March afterwards Camp saw Scott at Fort Worth, and demanded payment, and obtained no satisfaction. Camp then drew a draft on Scott for the amount of the lease price, and the draft was protested. Scott in March, by letter, returned the lease to Camp & Caldwell, with his name torn therefrom. Scott was in possession of the land, and was using and continued to use it.

It is concluded that the evidence is sufficient to sustain the general finding involved in the verdict of the jury, that appellants agreed to

lease the land from appellees at 5 cents per acre per annum for two years from May 1, 1903, and to pay back rentals at 3 cents per acre from January 1, 1902, to May 1, 1903, and that the lease was executed in duplicate and signed by the parties, and one copy each held by lessor and lessee, and that appellants accepted the terms and offered to litigate the back rentals and that appellees acceded to the request, and that Scott used the lands under the lease. We assume the correctness of the findings. It is also shown and found that the parties discussed the fact of about six sections of the thirty-nine sections being then lying in the Youngblood pasture, but that there was an equal amount of the land which Youngblood had leased in another pasture controlled by Scott, and it was agreed that these lands should be controlled in the same way.

*After stating the facts as above.*—The first assignment of error complains that the court erred in changing the venue of the cause to Midland County. In the District 'Court of Martin County the appellants, who were defendants in the court, filed an application for change of venue, setting forth reasons for removing the case from that county. In this application for change of venue, Howard County, an adjoining county, was alleged to be disqualified, and also the following was alleged with reference to Midland County, an adjoining county: "Camp & Caldwell, the attorneys for the plaintiffs herein, reside in Midland County, Texas, and their influence and standing in said Midland County are so great that these defendants can not expect a fair and impartial trial in Midland County." The application for change of venue was properly verified by the appellants and by compurgators. No affidavit was filed by the appellees controverting the allegations in the application for change of venue with reference to Martin and Howard Counties, but the allegation as to Midland County was controverted by appellees. No evidence was offered by either appellants or appellees on the application. The court entered an order removing the case to Midland County, and the appellants at the time objected and reserved an exception.

Appellants contend that the disqualification of the nearest county to the county of the forum can only be shown in the application for change of venue, and can not be controverted. By article 1271, Revised Statutes 1895, it is provided what an application for change of venue shall contain. By article 1272 it is provided that the application may be controverted by the opposite side by affidavit showing, among other things, the untruth "of the facts set out in the application." By article 1273 it is provided: "Upon the grant of a change of venue, as provided for in the two preceding articles, the cause shall be removed to some adjoining county, the courthouse of which is nearest to the courthouse of the county in which the suit is pending, unless it is made to appear in the application that such nearest county is subject to some objection sufficient to authorize a change of venue therefrom in the first instance; but the parties may by consent agree that it shall be changed to some other county, and the order of court shall conform to such agreement." It is clear from the statute that the disqualification of the nearest adjoining county must be shown in the application. It is as clear that it is mandatory upon the court to enter the order of removal to such

nearest adjoining county unless the disqualification of such nearest county is shown in the application. Such disqualification of the nearest county must be such as would be sufficient to authorize a change of venue therefrom in the first instance. So, the application must challenge both the county of the forum and the adjoining county if the removal from each is sought in the application. Consequently, where the disqualification of the nearest adjoining county is alleged in the application, such objection as is assigned to such nearest county becomes and is as much a part of the application to be considered by the court, as the reasons of disqualification assigned to the county where the suit is pending. The disqualification as to each county must be under at least one of three subdivisions of article 1271, Revised Statutes. The statute permits the application to be controverted, and provides that "if such application is thus attacked the issue thus formed shall be tried by the judge, and the application granted or refused as the law and facts shall warrant." The article does not provide what part of the application shall be controverted, neither does it provide that any part of the application shall not be controverted. The intendment of the statute is to make the application an entirety as to all the matters alleged, and not severable. The purpose of the statute in allowing "the application" to be controverted is to permit inquiry into the truth of the facts set out in the entire application as made, and, when so informed, that the court may act with full knowledge of the true situation. We can see no reason from the language or intendment or purpose of the statute, to prevent the opposing side from controverting both the disqualification of the county where the suit is pending, and the nearest adjoining county. Nor do we think the statute forbids or denies the right to the opposing side to controvert the disqualification of the nearest adjoining county only, if it should be conceded that the county where the suit is pending possesses disqualifications alleged in the application. In this case the alleged disqualification of Midland County was attacked by affidavit of the opposing side. No evidence being offered, the court determined the matter on the affidavits. We can not say, as a matter of law, that the matters set out are sufficient to require the removal from Midland County in the first instance. We do not think the court erred, or abused his judicial discretion, in the matter, and in fact we do not think the grounds set out are sufficient to deny the removal to Midland County. The assignment is overruled.

The second assignment of error is based upon the fact that part of a letter to appellees from their attorneys was withheld from the jury. Appellees' attorneys read in evidence part of the letter to the jury. Appellants' counsel demanded that the balance of the letter be read. Appellees' counsel claimed that the balance of the letter was a privileged communication between counsel and client; and the court, after reading the letter, sustained the objection. Appellants did not ask the court, according to the exception, to permit them to see that part of the letter; and there is nothing to show that the court forbade the inspection of the letter by them. There is nothing by which we can determine whether any error whatever was committed. The court evidently considered, after reading the letter, that the excluded part did not refer to or have any bearing on the subject matter of that part read by the appellees, and

the rest was privileged matter not concerned with that read. We can see no reason to suppose that appellants suffered any prejudice by the ruling. The rule that where one party has introduced a part of a writing in evidence the opposite party has a right to introduce the whole of the writing, means and refers to the whole of the writing bearing on, having connection with, and relating to the same subject matter, which is necessary to make it fully understood or to explain the same. It does not mean to include immaterial or irrelevant matter. The assignment is overruled.

We do not think the ruling of the court complained of in the third assignment constitutes such error as should be held reversible error in this case, and the assignment is overruled. The remark of the witness amounts to his conclusion only, and could not have had any influence upon the jury either way.

The fourth assignment of error complains of the refusal of the court to give a special charge to the jury, that the negotiations did not amount to a contract until the written lease was signed. The instruction sets forth certain conditions and then maintains that no finding that a contract was made and closed can be made from such recited testimony, and states the conclusion drawn that it was the intention of the parties that the contract was to be closed by writing. A reference to the main charge of the court shows that the case was not submitted to the jury upon the theory of negotiations, but upon the written lease, and that the jury were only permitted under the charge to return a verdict for appellees in the event they found the written contract itself went into effect and that the minds of the parties met thereon. The charge of the court confines the jury to finding from the evidence that the several parties "entered into a contract of lease for the 39 sections of land mentioned in plaintiff's first amended petition," and then follows with the statement of the substance of the lease. The charge sufficiently confined the finding to the express contract sued on. The refusal of the charge could not have had any effect upon the result. The verdict of the jury was upon the contract sued upon, which they found to be the contract. The assignment is overruled.

The fifth and sixth assignments, presented together, are equivalent to an instruction to the jury to return a verdict for the defendants, for the reasons that the minds of the parties did not meet upon the terms of the lease. We think there was evidence to require the court to submit to the jury, and require their finding as to whether the terms of the agreement was complete. It can not be said as a matter of law that the evidence in the case does not show that the parties did mutually agree upon the terms of the lease. Camp testified that in the conversation with Scott over the 'phone in reference to the written lease, a copy of which was at the time signed by the appellees and in the possession of Scott, he said, "Mr. Scott, my instructions from my clients are if this matter is not settled they are going to cancel your lease and lease the land to other parties," and that Scott replied, "If they do I will sue them for damages; I have got that lease, and have tendered New York exchange, and have leased the land; and if you lease that land to anybody else I will sue you for damages." He further testified that in the conversation "Mr. Scott suggested that the matter of back rent or

lease be litigated. I said to him, 'Mr. Scott, what is the necessity of having litigation?' He replied, 'I don't care for litigation; let them go on and sue me, if they think I am liable.' " The effect of the testimony is that Scott insisted upon the lease standing in force, as written, and suggested that the back rent be litigated. Camp testifies that after conferring with appellees and acting for appellees, he wrote Scott the following letter as an acceptance of Scott's insistence and suggestion: "We are instructed by Messrs. Russell, Dusenberry & Bulkely to accept the rentals of $1,248 on the lease made to you, and let the question of back rentals rest for the present, the acceptance of the lease money not to be in any way a waiver of the question at issue of their right to collect the back lease." The insistence of Scott in holding the lease as written, and his request to "litigate the back rentals," was an acceptance and continuance of the terms as expressed in the written agreement, and not a withdrawal from the terms, if it be true that he made such insistence, and the jury so found. It would constitute an acceptance as to the written lease sued on intended by the parties to finally create legal relations and to put into force the lease, even though not including legal liability for a prior agreement to pay back rentals. The terms of the written lease were sufficiently definite and were finally concluded. There was no withdrawal or modification of these terms so concluded as expressed in the written lease, only a proposal to litigate a part of the orally agreed terms. These were acts of acceptance. There was no lack of mutuality as to the consideration expressed in the lease of the land as to pay for the land from May 1, 1903, to May 1, 1905. It was for the jury to determine whether that final agreement was made. We do not think the statement in the letter, relied on in the proposition, is of importance as affecting the terms of acceptance. The letter is definite, and leaves no doubt as to the liability assumed by Scott. The assignments are overruled.

We do not think the court erred in refusing to give the special charge complained of in the seventh assignment of error, to the effect that there was no express contract and that the lease should not go into effect unless the letter of December 26, 1903, was actually received by Scott himself. The letter was duly mailed to Scott. Scott says that, owing to his many interests, he was seldom at home, and that his secretary received and opened his letters. There is no evidence that the letter was not received by the secretary. Caldwell testifies that Scott stated to him that he had gotten the letter. Where correspondence and negotiation is transmitted through mail it has been held that it is not material that the letter of acceptance be actually received. (Ferrier v. Storer, 19 N. W., 288; Hunt v. Higman, 30 N. W., 769; Bishop v. Eaton, 42 Am. St., 437.) However, in this case the "back rentals" were finally eliminated from the contract of lease, and it could be so ruled under the evidence. But there is other evidence besides the letter that the proposition of Scott embodied in his conversation over the 'phone was accepted and adopted. When Caldwell visited Fort Worth in March afterwards, he demanded the payment of the first installment of the lease, and the further fact that he drew the draft on Scott for the first installment, both amounted to an acceptance of the proposition, holding the lease in force as written, according to Camp's version of the con-

versation over the 'phone. Scott was in possession of the land, using it, and continuing to use it after the conversation over the 'phone. By this he gave the lessors the election at any time to consider the lease in effect regardless of any acceptance to be communicated to him. It would have been error for the court to have singled out the letter as the particular manner of acceptance, and instructed the jury that if the letter was not received by Scott himself there could be no acceptance and no contract.

The eighth and ninth assignments are overruled. The instruction in the ninth assignment does not require the jury to find that Scott's belief was superinduced by any representation of Caldwell's or any other person's; neither does it require that the mistake should be mutual between the lessor and the lessee.

The tenth assignment is overruled.

There being no reversible error in the record, the case is ordered affirmed.

### ON REHEARING.

We have carefully considered the motion for rehearing. The written lease sued on, and made a part of the petition, provided for the lease of the land in question from the 1st day of May, 1903, for the period of two years ending the 1st day of May, 1905, at the price of $1,248 per year, and attorney's fees and interest in default of payment. A count in the petition sought a recovery upon this lease as an executed contract. The findings of the jury in this case were that appellants executed a written contract of lease whereby they bound themselves to pay the sum of $1,248 per year for the land from May 1, 1903, to May 1, 1905, and attorneys' fees and interest upon default of the payment. There was involved in the findings of the jury that there was not included in this contract the agreement to pay the back rentals on the land from January 1, 1902, to May 1, 1903, the date of the written lease. The judgment rendered and entered in this case did not include the back rentals, but only the lease terms from May 1, 1903, to May 1, 1905, as provided in the written lease sued upon. There was also contended for in the petition and in the evidence a recovery upon the back rentals, as well as the amount of the lease for which the judgment was entered. As there was no recovery for the back rentals, and only for the amount provided for in the written lease, the theory of the case involving the back rentals would be eliminated, because the evidence is sufficient to sustain the finding of the jury that the minds of the parties met in a mutual and final agreement to pay the amount of the judgment entered for a lease of the land for two years from May 1, 1903, to May 1, 1905, as expressed in the terms of and provided for by the written lease sued on. The evidence is sufficient to show that Scott, acting for the appellant, and Camp, acting for the appellees, mutually agreed upon the amount of the lease provided for in the written lease, and that the lease was put in force and effect for that consideration, even though it might be claimed as a fact that the negotiations as to the back rentals were not agreed upon and finally included as a part of the lease. And even if the negotiations leading up to the final agreement did contemplate including back rentals as a part of the final agreement, yet the evidence is

abundant to sustain the finding that this part of the consideration of the lease, and portion of the negotiations and previous agreement, was finally mutually abandoned as a term of leasing the land, and that the written lease, as it was written and signed and with the considerations therein expressed, was put in full force and effect upon the final terms only of pay for the two years lease expressed in the written lease. As the judgment was rendered only upon this provision of the lease, we think it is sustained by the pleading and evidence.

Upon request we make the correction of the evidence as to a conversation occurring between Scott and Caldwell over the 'phone so as to add thereto: Camp testified, "Then Mr. Scott said he had tendered us New York exchange for the first year's rental and he had the lease and he was going to keep it, that he was not going to pay any back rental because he had been advised by his attorneys that he was not liable;" and that in reply to the question by Camp: "If a bond is given will you pay the back lease?" Mr. Scott replied, "No, I will not;" that "Scott said he would not pay the back lease, neither would he turn over the lease. I do not recollect anything else that occurred in the conversation, and that was the only conversation I ever had with Scott over the telephone with reference to the matter in controversy."

We are of the opinion that the motion for a rehearing should be overruled.

*Affirmed.*

Writ of error refused.